Hillsborough-northern judicial district
No. 2007-396

### THE STATE OF NEW HAMPSHIRE

v.

### CHRISTOPHER LEGERE

Argued: September 11, 2008
Opinion Issued: October 15, 2008

*Kelly A. Ayotte*, attorney general (*Thomas E. Bocian*, attorney, on the brief, and *N. William Delker*, senior assistant attorney general, orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

Christopher Legere, by brief, *pro se.*

GALWAY, J. The defendant, Christopher Legere, was convicted following a jury trial in Superior Court (*McGuire*, J.) of the second degree murder of John Denoncourt. *See* RSA 630:1-b, I(a), I(b) (2007). He appeals, arguing that the trial court erred in admitting the testimony of various witnesses. We affirm.

The following facts appear in the record. During the overnight hours of June 24-25, 2006, Denoncourt rode his motorcycle to the Three Cousins Pizza and Bar (Three Cousins) in Manchester. When he arrived he encountered William Hill and Tracey Beardsell outside. Shortly thereafter an argument ensued when Hill asked to ride Denoncourt's motorcycle, but Beardsell objected because she was concerned about his intoxication. Also, Beardsell and Denoncourt began arguing after she told him that she was concerned about his shirt and that he ought not wear it inside Three Cousins. Denoncourt was wearing what was known as a "support shirt," with symbols indicating sponsorship of the Hells Angels motorcycle club. Three Cousins was known as a meeting place for members of a rival group, The Outlaws. Also, Three Cousins had a standing policy prohibiting support shirts and similar clothing. The defendant was a member of the Outlaws. Denoncourt did not remove his shirt.

At some point, the arguments outside attracted the attention of those inside Three Cousins, and numerous people, including the defendant, exited the bar. Outside the bar a melee began, though it is not clear who was involved. During this fight, several gunshots were fired, one of which struck Denoncourt in the chest. Denoncourt ran, but after approximately 350 feet he collapsed and died. Immediately thereafter, Beardsell ran into Three Cousins and announced that everyone should leave because the Hells Angels would be coming. The bar quickly emptied, and some witnesses reported seeing the defendant depart in a white sport-utility vehicle.

The defendant was subsequently indicted on two alternative counts of second degree murder. Following a jury trial, the defendant was convicted on both counts. This appeal followed.

## I. Statements of Cheryl Diabo

The defendant contends that the trial court erred in permitting the introduction of a statement to the police by an eyewitness, Cheryl Diabo, in violation of his rights under the State and Federal Constitutions. During trial, the State moved *in limine* for the admission of Diabo's June 25, 2006 statement to the police in which she identified the defendant from a photographic line-up, as well as her recorded interview with the police on July 24, 2006. The State sought to admit these statements because Diabo

claimed to have no current memory of the shooting or her interactions with the police. Her memory loss was alleged to be a result of emotional trauma resulting from the unrelated murder of her boyfriend, Mark McManus, some months after Denoncourt's death. The defendant objected to the admission of both statements.

The trial court convened a hearing on the motion at which Diabo confirmed that she had lost her memory of Denoncourt's shooting and her subsequent interactions with police. Diabo's psychiatrist, Dr. Elizabeth Blencowe, testified that Diabo did not have "true" memory problems, and that continued treatment might aid in the recovery of her memory. Dr. Blencowe also opined that while she believed Diabo was not "deliberately or consciously trying to portray herself as not having memory," she could not give a professional opinion on whether Diabo was being "completely truthful" about her memory loss.

Following this hearing, the trial court issued an order stating, in part, that it was "not convinced that [Diabo] does not have a present memory of the circumstances surrounding John Denoncourt's murder." Therefore, the trial court did not permit the State to introduce the July 24 recorded interview. The trial court, however, did permit the State to introduce Diabo's statement of identification during the photographic line-up, but only through the police.

In front of the jury, Diabo testified consistently with her testimony at the earlier hearing. After giving some background testimony, Diabo averred that she had no memory of the events surrounding Denoncourt's murder and that despite reviewing her earlier statements, her memory had not been restored. During cross-examination, the defendant asked only two questions, both seeking information about whether Diabo had been threatened. She answered both questions. The State then, through Detective Joseph Mucci of the Manchester Police Department, introduced evidence that Diabo had identified the defendant in a photographic line-up, that she was nervous about cooperating, and that she had stated she feared retaliation. On appeal, the defendant contends that the introduction of Diabo's statement of identification violated the State and Federal Constitutions. We deal first with the defendant's claim under the State Constitution. *See State v. Ball*, 124 N.H. 226, 232 (1983).

The defendant contends that admitting Diabo's statement of identification violated his confrontation rights under the New Hampshire Constitution, as well as the New Hampshire Rules of Evidence. While the United States Supreme Court has recently modified its Confrontation Clause analysis, *see Crawford v. Washington*, 541 U.S. 36 (2004), we have not adopted, and neither party argues that we should adopt, *Crawford* as applicable to claims under the State Constitution. Instead, we have applied

the analysis in *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). *See State v. Munoz*, 157 N.H. 143, 148 (2008); *State v. Ayer*, 154 N.H. 500, 511 (2006), *cert. denied*, 128 S. Ct. 63 (2007). As neither party argues for the imposition of a different standard, we confine our analysis to the *Roberts* standard.

 Under *Roberts*, a prior statement of an unavailable hearsay declarant is admissible if it bears adequate "indicia of reliability," or if there is a showing of particularized guarantees of trustworthiness. *Roberts*, 448 U.S. at 66. Reliability "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.*

Here, the defendant argues that Diabo was unavailable, but that her out-of-court statement did not fall within New Hampshire Rule of Evidence 801(d)(1)(C), which he concedes is a firmly rooted hearsay exception. As noted by the defendant, his claims under the constitution and the rules of evidence overlap: "Thus, if Evidence Rule 801(d)(1)(C) does not cover the statement, the [trial] court erred in admitting it both under the Rules of Evidence and under the New Hampshire Constitution. Conversely, if that rule covers the statement, Legere's State constitutional claim and his evidence rule claim alike would fail."

 Even if we assume that Diabo was unavailable, we would conclude that Diabo's statement falls within a firmly rooted hearsay exception. Rule 801(d)(1)(C) of the New Hampshire Rules of Evidence provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving the person. This rule "requires only an opportunity for cross-examination; this requirement is satisfied if the declarant testifies and is available for cross-examination, regardless of whether the declarant is actually cross-examined." *State v. Delgado*, 137 N.H. 380, 382 (1993). "Application of Rule 801(d)(1)(C) . . . does not hinge on a contradiction between a witness's in-court and out-of-court statements; it turns on the existence of a statement of identification." *Id.* at 382-83. The rule is intended "to address situations where a memory loss makes it impossible for the witness to testify about details of the events underlying an earlier identification." *Id.* at 383 (quotations and ellipses omitted). "Admitting only those portions of the prior identification that mirrored a witness's in-court testimony would likely compound confusion created by omissions or inconsistencies in the witness's in-court testimony, and frustrate the purpose of the rule." *Id.*

 Here, Diabo made an earlier statement of identification, and was produced for cross-examination at trial. The defendant, therefore, had the

opportunity to cross-examine her, thus satisfying the rule, regardless of whether she was actually cross-examined.

Citing *People v. Learn*, 863 N.E.2d 1173 (Ill. App. Ct. 2007), the defendant argues that because Diabo's memory loss was more acute than that of the declarant in *Delgado*, *Delgado* is not controlling. We do not agree. First, nothing in *Delgado* defines a point at which a witness's memory loss, or professed memory loss becomes so pronounced as to render a prior identification inadmissible. As regards *Learn*, the rule of evidence at issue there was significantly different from Rule 801(d)(1)(C), making any meaningful comparison difficult. *See Learn*, 863 N.E.2d at 1178. Additionally, the court in *Learn* determined that the witness did not "testify" as contemplated by the rule because she did not testify meaningfully to any background information before beginning to cry and then not answering any more questions. *Id.* Here, in contrast, Diabo did testify to background information and was available for cross-examination and thus satisfied the requirements of the rule. *See Delgado*, 137 N.H. at 382-83. For these reasons, we conclude that Diabo's prior statement of identification fell within a firmly rooted hearsay exception and, therefore, its admission did not violate the rules of evidence or the State Constitution.

■ Relying upon *Crawford*, the defendant next contends that the introduction of Diabo's identification violated his right to confrontation secured by the Sixth Amendment to the United States Constitution. In *Crawford*, the United States Supreme Court stated that the Confrontation Clause's "ultimate goal is to ensure reliability of evidence" and that this reliability was to "be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61. To preserve the goal of reliable evidence tested by cross-examination, the Supreme Court held that testimonial statements of witnesses absent from trial are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. Here, it is undisputed that Diabo's identification was testimonial, and that the defendant had no prior opportunity to cross-examine her about it. Accordingly, the admissibility of her statements depends upon whether, despite her physical appearance at trial, Diabo was, in effect, "unavailable" as pertains to a federal Confrontation Clause analysis. Because this is an issue of first impression in New Hampshire, we look to the guidance of other jurisdictions. *See State v. O'Maley*, 156 N.H. 125, 134 (2007).

Recently, the Supreme Court of Minnesota addressed this issue on similar facts. In *State v. Holliday*, 745 N.W.2d 556 (Minn. 2008), the defendant was charged with shooting and killing another man. *Id.* at 560. At trial, the State called A.A. to testify regarding information he gave in

interviews with the police and the prosecution. *Id.* at 561. After taking the stand, A.A. claimed no memory of his prior discussions. *Id.* He recalled only that he had talked with someone in the prosecutor's office, but could not remember the substance of that conversation. *Id.* The contents of A.A.'s statements were then introduced into evidence through other witnesses. *Id.*

The defendant argued that admitting A.A.'s statements violated the Confrontation Clause. *Id.* at 564-65. In conducting a thorough analysis of *Crawford,* the court noted that "[l]anguage from the Supreme Court's *Crawford* decision indicates that the admission of a witness's prior statements does not violate the Confrontation Clause where the witness appears for cross-examination and claims that he or she cannot remember either making the statements or the content of the statements." *Id.* at 565. Specifically, it relied upon the conclusion in *Crawford* that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. It is therefore irrelevant that the reliability of some out-of-court statements cannot be replicated, even if the declarant testifies to the same matters in court." *Crawford,* 541 U.S. at 59 n.9 (quotations and citations omitted); *see Holliday,* 745 N.W.2d at 565.

The Minnesota court noted that the Supreme Court's conclusion that the Confrontation Clause does not bar the admission of prior testimonial statements as long as the declarant is present at trial to defend or explain it could be interpreted to mean that the declarant must actually defend or explain the prior statement. *Holliday,* 745 N.W.2d at 565. We agree, however, with the Minnesota court's conclusion that this

> interpretation both ignores the fact that the [Supreme] Court's language still focuses on presence and ability to act without requiring that the record show the declarant actually did defend or explain the statement, and is at odds with the Court's more explicit assertion that when the declarant appears for cross-examination at trial, the Confrontation Clause places no con-straints at all on the use of his prior testimonial statements.

*Id.* at 565-66 (quotations and citation omitted).

The Minnesota court relied, as have other courts, *see, e.g., State v. Pierre,* 890 A.2d 474, 499-500 (Conn.), *cert. denied,* 547 U.S. 1197 (2006), upon a line of United States Supreme Court cases beginning with *California v. Green,* 399 U.S. 149 (1970). In *Green,* the Supreme Court reversed the California Supreme Court's decision to exclude, on Confrontation Clause grounds, the testimony of a witness present at trial, but who claimed not to recall the relevant events. *Id.* at 151-52, 164. In so ruling, it stated that "where the declarant is not absent, but is present to testify and to submit to

cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem." *Id.* at 162.

■ Following *Green*, in *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985), the Supreme Court, after referencing Justice Harlan's concurrence in *Green* that "[g]enerally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish," concluded that:

> the assurances of reliability our cases have found in the right of cross-examination are fully satisfied in cases such as this one, notwithstanding the witness' inability to recall the basis for his opinion: the factfinder can observe the witness' demeanor under cross-examination, and the witness is testifying under oath in the presence of the accused.

Thus, the Court concluded that the prosecution's expert witness testimony was admissible even though he had forgotten the basis for his professional opinion. *Id.* at 16. The Court concluded that:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Id.* at 21-22.

■ In *United States v. Owens*, 484 U.S. 554, 564 (1988), the Supreme Court held that the Confrontation Clause was not "violated by admission of an identification statement of a witness who is unable, because of a memory loss, to testify concerning the basis for the identification." Relying upon *Fensterer*, the Court stated that the opportunity for effective cross-examination

> is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination) the very fact that he has a bad memory.

*Id.* at 559 (citation omitted). "The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." *Id.* at 560.

*Crawford* neither overruled nor undermined either *Fensterer* or *Owens. See State v. Price*, 146 P.3d 1183, 1191 (Wash. 2006); *State v. Real*, 150 P.3d 805, 807-08 (Ariz. Ct. App. 2007). Indeed, it specifically relied upon *Green* in concluding that a declarant's appearance at trial removes all Confrontation Clause constraints on the use of prior testimonial statements. *Crawford*, 541 U.S. at 59 n.9. As such, *Green, Fensterer* and *Owens* remain good law.

Other jurisdictions considering the issue have also concluded that memory loss does not render a witness unavailable for Confrontation Clause purposes. In *Pierre*, the Supreme Court of Connecticut noted: "The defendant's argument equates a declarant's inability or unwillingness to remember prior statements made to the police with a general unavailability from cross-examination in its entirety." *Pierre*, 890 A.2d at 498. The court was not persuaded by the defendant's argument and concluded that although the witness claimed no memory of his prior statements, he was, nonetheless, available because he was placed on the stand, under oath and responded willingly to questioning. *Id.* at 501-02.

Likewise, the Supreme Judicial Court of Maine has concluded that "a witness is not constitutionally unavailable for purposes of Confrontation Clause analysis when a witness who appears and testifies is impaired." *State v. Gorman*, 854 A.2d 1164, 1177 (Me. 2004) (citation omitted), *cert. denied*, 544 U.S. 928 (2005). Thus, a witness who claimed a lack of memory as well as a potential for delusional thoughts due to medication was not deemed unavailable. *Id.*

■ Accordingly, like most courts that have considered the issue, we conclude that when a witness is presented for cross-examination, the Confrontation Clause does not bar the admission of a prior statement. *Accord, e.g., Price*, 146 P.3d at 644, 650; *Real*, 150 P.3d at 808; *Johnson v. State*, 878 A.2d 422, 428-29 (Del. 2005); *People v. Gunder*, 59 Cal. Rptr. 3d 817, 823-24 (Ct. App. 2007); *People v. Sharp*, 825 N.E.2d 706, 713 (Ill. App. Ct. 2005). *But see People v. Learn*, 863 N.E.2d at 1179.

The defendant urges us to distinguish *Green, Fensterer*, and *Owens* on the grounds that: (1) there is good reason to doubt the genuineness of Diabo's claim of memory loss; (2) her claim of memory loss is factually distinguishable from *Owens*; and (3) there are no "realistic weapons" with which to attack Diabo's statement. *See Owens*, 484 U.S. at 560.

■ First, the defendant argues that "[t]he falsity of Diabo's claim of memory loss brings this case within the rule of cases finding no adequate

opportunity to cross-examine when a witness, properly or otherwise, simply refuses to answer questions at trial." *See, e.g., Douglas v. Alabama,* 380 U.S. 415, 420 (1965). However:

> The circumstance of feigned memory loss is not parallel to an entire refusal to testify. The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility.

*Gunder,* 59 Cal. Rptr. 3d at 823-24. Moreover, "[t]he feigned or real absence of memory is itself a factor for the trier of fact to establish, but does not render the witness unavailable." *Fowler v. State,* 829 N.E.2d 459, 466 (Ind. 2005), *cert. denied,* 547 U.S. 1193 (2006); *see also United States v. Keeter,* 130 F.3d 297, 302 (7th Cir. 1997) (witness feigning amnesia during trial still subject to cross-examination), *cert. denied,* 523 U.S. 1034 (1998). Regardless of the authenticity of Diabo's claim of memory loss, because she was present at trial and subject to whatever cross-examination the defense wished to attempt, the jury had the opportunity to assess her credibility and, by extension, the credibility of her earlier statement.

Second, the defendant argues that because Diabo's memory loss is more acute than that in *Owens,* this case is distinguishable from it. While Diabo's claim of memory loss is more severe than in *Owens,* we are not persuaded that a contrary result is compelled by that difference. Remembering that a prior statement was made, yet not recalling the reasons for it or the circumstances leading up to it, imparts little, if any, information about the veracity of the declarant that could not otherwise be established or challenged by cross-examination. Thus, we do not agree that the severity of Diabo's memory loss requires a departure from *Owens.*

 Finally, the defendant contends that, in *Owens,* the defense had "realistic weapons," *Owens,* 484 U.S. at 560, with which to dispute the reliability of the out-of-court statement, whereas no such dispute could be raised here. We do not agree. Diabo testified at trial about, for example: arriving at the bar with her boyfriend, setting up for her friend's party in the back room, that the bar was busier than usual that night, that she and her sister cleaned up the back room after the party, that after cleaning up she went out into the main portion of the bar for a drink, that she was drinking "Absolut[] grapefruit," and that her boyfriend stayed with her during the course of the evening. The jury had the opportunity to assess her testimony and its reliability and the defendant had the opportunity to confront her about any or all of these recollections. Moreover, the defendant was able to show that which is often a prime objective of cross-

examination, that Diabo had a bad memory. *See id.* at 559. Accordingly, we do not agree that the defendant was without "realistic weapons" with which to test her credibility. For these reasons, we conclude that Diabo was not "unavailable" for purposes of the Federal Confrontation Clause and that her prior statement was not barred by it.

## II. Expert Testimony

The defendant contends that the trial court erroneously admitted certain expert testimony about the Outlaws on the ground that its prejudice substantially outweighed its probative value. Prior to trial, the State filed two motions *in limine*, to which the defendant objected, seeking the admission of evidence about the defendant's involvement with the Outlaws, the organizational structure of the Outlaws, the rivalry between the Outlaws and the Hells Angels, and the meaning of the symbols on Denoncourt's shirt. The State contended that the evidence was relevant to the issues of the defendant's identity and motive to shoot Denoncourt, as well as the credibility of other testifying witnesses. The first motion was directed at the general admissibility of this evidence. The second was concerned with the admission of expert testimony. It is only the expert testimony that is now at issue.

The trial court ruled, in relevant part, that it would allow expert testimony:

a. Relating to the histories (briefly) of the Hells Angels and Outlaws;

b. That the Hells Angels and Outlaws have had a violent rivalry, particularly surrounding territorial issues; and

c. The shirt the victim was wearing on June 25, 2006 was a Hells Angels support shirt.

The trial court also ruled that the State could not introduce evidence that the defendant was "an enforcer," in part because it would be highly prejudicial.

At trial, the State's expert witness, Terry Katz of the Maryland State Police, testified about the Outlaws, Hells Angels and other similar motorcycle groups, and about their size, history and organizational structures. Regarding the Outlaws, Katz testified that there are local chapters organized under the auspices of regional and national bodies, and that unauthorized formation of a club "would subject you to severe repercussions, to include violence." He also stated that if a member of the Outlaws did not follow the club's rules, the consequences range "from being fined to

taking a physical beating to be thrown out of the club or taking a beating, all the way up to—there've been homicides for people that have violated the rules." He also testified to groups like the Outlaws defining themselves as "one percenters," signifying that they "exist by their own rules, not society's." Katz then testified to the various terms used to designate degrees of membership and what it means for a person to be a "full patch member." He defined the term "associates," in part, by stating that "[t]hey are people that do legal—or illegal things with [members]."

Katz next testified about the decades-long antagonistic relationship between the Outlaws and the Hells Angels. He testified that the groups are very territorial, that the territory can include clubhouses, bars and restaurants, and that violence can result from one group's invasion of another's territory. He also testified about the different groups' "support gear," that this gear can be obtained in any number of ways, including over the Internet, and that people not associated with the group can and do buy and wear this gear, sometimes without knowledge of its meaning. He then offered the example of a man in Florida who had, unknowingly, worn a Hells Angels shirt to an Outlaws event and was confronted by members of the Outlaws before police intervened to protect him.

Katz also testified that, "[u]nlike what normal people or the average citizen would think of respect, respect in the Outlaw motorcycle gang, in my experience, means fear. . . . So to be disrespected means you don't fear me." Finally, he testified that cases involving the Outlaws are difficult to investigate because witnesses do not want to be involved because they do not want to make an enemy of the Outlaws. He stated that one of the mottos of the Outlaws was "Snitches are a dying breed." During Katz's testimony, the defendant raised only one objection. At no point did the defendant request, or the trial court give, a limiting instruction to the jury.

The defendant now argues that parts of Katz's testimony falling into categories (a) and (b), as defined by the trial court, were unfairly prejudicial and should not have been admitted. "We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion." *State v Yates*, 152 N.H. 245, 249 (2005). To demonstrate an unsustainable exercise of discretion, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.* "New Hampshire Rule of Evidence 401 defines relevant evidence as 'evidence having any tendency to make the existence of any fact that is of conse-quence to the determination of the action more probable or less probable than it would be without the evidence.' However, evidence that is relevant

may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.*; *see* N.H. R. Ev. 403.

> Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case. Unfair prejudice is not, of course, mere detriment to a defendant from the tendency of the evidence to prove his guilt, in which sense all evidence offered by the prosecution is meant to be prejudicial. Rather, the prejudice required to predicate reversible error is an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged.

*Yates*, 152 N.H. at 249-50.

■■■ The defendant does not challenge Katz's certification as an expert. Additionally, he acknowledges that expert evidence, at least as is relevant to motive and the credibility of witnesses, is permissible, a view in accord with that of courts around the country. *See, e.g.*, Annotation, *Admissibility of Evidence of Accused's Membership in Gang*, 39 A.L.R.4TH 775, 776 (1985 & Supp. 2008) ("Gang membership has frequently been found to be probative and admissible, for example, as evidence of a possible motive for the crime, particularly in homicide cases where the defendant and his victim are shown to have been members of rival gangs . . . ."). The defendant, however, argues that despite its relevance, parts of Katz's testimony were sufficiently prejudicial that they ought not to have been admitted. We now turn to the defendant's specific claims of error.

The defendant first takes issue with some category (a) evidence, specifically Katz's testimony relating to: (1) what he describes as evidence of the crimes and/or criminal propensities of the Outlaws, apart from that relevant to the rivalry with the Hells Angels or the Outlaws' capacity to intimidate; (2) "one percenters" who "exist outside society's rules;" (3) a culture of respect based upon fear; (4) "associates" who "do legal—or illegal things" with full members; and (5) the punishments visited upon those who do not follow club rules. Regarding category (b) evidence, he objects to evidence relating to incidents of violence between the groups where the defendant was not involved, most particularly, the incident in Florida. According to the defendant, this testimony's probative value was outweighed by its prejudicial effect, or, if not, there was similar, less prejudicial evidence which made this testimony unnecessary.

■ As to Katz's testimony about the Outlaws being "one percenters" who exist by their own rules, and who have a culture of respect founded upon fear, with violent retribution for failure to adhere to club rules, and about their lengthy feud with the Hells Angels, we conclude that such testimony was highly probative of both the defendant's intent and motive, as well as on the issue of witness credibility.

Katz's testimony helped to explain the Outlaws' code of conduct generally and informed the jury of the manner in which the group would discipline those who violated club rules. It, therefore, provided context for the kind of reaction a member of the Outlaws might have to a person who had ventured into Outlaws' territory while demonstrating support for a rival club. Moreover, it clarified that it was not simply support for a rival group that was at issue, but support for a group with which the Outlaws had a long, hostile and even violent relationship. The defendant himself believed that the issue of the rivalry was important when, in a recorded telephone call from jail, he stated that he believed the Hells Angels were attempting to downplay the fact that Denoncourt "was wearing one of their shirts, coming to one of our bars." As such, this evidence helped to explain an otherwise inexplicable act, *i.e.*, the murder of a man for wearing a particular shirt. *See Ayala v. State*, 923 A.2d 952, 961 (Md. Ct. Spec. App.) (the evidence of defendant's gang affiliation served to explain the otherwise inexplicable by providing a motive for the murder), *cert. denied*, 931 A.2d 1095 (Md. 2007); *People v. Gonzalez*, 25 Cal. Rptr. 3d 124, 133 (Ct. App. 2005) ("The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible."); *State v. Ruof*, 252 S.E.2d 720, 725 (N.C. 1979) (evidence of defendant's affiliation with Outlaws admissible to show motive though motive not an element of the charged offense).

Furthermore, informing the jury that those who failed to follow the rules faced violent retribution explained why an Outlaws member might react with violence to protect the group's territory. Evidence that these groups are willing to use violence to enforce their rules, and that there was a need to defend what they believed was their territory, demonstrated a motive for the defendant to violently defend his territory to build respect through fear, and to avoid the risk of being seen as having violated club rules by failing to protect the group's territory. *See People v. Gonzalez*, 135 P.3d 649, 657 (Cal. 2006) ("It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect.'" (quotation omitted)). As such, Katz's testimony about the culture of violence and the long-standing feud with rival groups, particularly the Hells Angels, aided the jury in understanding

why the defendant might violently retaliate for the perceived slight of wearing a Hells Angels support shirt in Outlaw territory.

 Additionally, evidence of the Outlaws' violent nature and disregard for society's rules was probative on the issue of witness credibility because it explained why some witnesses might be reluctant to cooperate. For example, Detective Mucci testified that Diabo was reluctant to cooperate with the police because she feared retaliation, and other officers testified that they had encountered reluctant witnesses. Even the defendant's mother, in a recorded telephone call, stated that she was afraid of what might happen to her because she feared retaliation. At trial at least one witness expressed reluctance to be involved for fear of retaliation. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness . . . ." *Id.* Knowledge of the witnesses' fears of retaliation coupled with the understanding that such fears were common in cases of this nature would give the jury a basis to evaluate their credibility.

 As to prejudice, we note that the potential for prejudice in the introduction of gang evidence is apparent. *See People v. Cruzado*, 700 N.E.2d 707, 715 (Ill. App. Ct. 1998) ("Courts acknowledge that a strong prejudice against . . . gangs may exist, particularly in metropolitan areas."); *People v. Davis*, 779 N.E.2d 443, 456 (Ill. App. Ct. 2002), *appeal denied*, 787 N.E.2d 176 (Ill. 2003). This risk is of particular concern where the evidence is only tangential to the charged offenses. *People v. Albarran*, 57 Cal. Rptr. 3d 92, 99 (Ct. App. 2007); *People v. Partida*, 16 Cal. Rptr. 3d 777, 785-86 (Ct. App. 2004), *superseded by People v. Partida*, 122 P.3d 765 (Cal. 2005). This potential for prejudice, however, does not necessarily make the evidence inadmissible; the question is whether the probative value is substantially outweighed by the danger of unfair prejudice. *Yates*, 152 N.H. at 249-50; N.H. R. Ev. 403. The defendant contends that Katz's testimony was unfairly prejudicial because it attributes a propensity to commit crimes to the Outlaws, and, by extension to the defendant, and because it "fosters in the jury an antipathy toward the Outlaws" and the defendant as a member.

Katz's testimony was directed at the general functioning of these groups and the history of their rivalry, not at the defendant or any member of his local chapter. While he testified that these groups have a violent past and that they deal harshly with breaches of acceptable protocol, his statements were in the context of explaining the reasons why a member might act violently in upholding club rules and why witnesses might fear being involved. While this evidence was prejudicial, we do not agree that the danger of unfair prejudice substantially outweighed its probative value.

As for the Florida incident, we find that Katz's testimony, considered in context, was probative. Katz was asked to explain support gear, what it means for people to wear it, and whether those wearing it understand the potential dangers created by wearing it in "rival territory." It was in this context that he spoke of the Florida incident. His testimony demonstrated the gravity of wearing one club's clothing in another's territory. As such, it was probative of the defendant's motive in confronting Denoncourt for wearing a Hells Angels support shirt in an area understood as belonging to the Outlaws. Additionally, reference to this incident was not unfairly prejudicial because Katz did not mention any violence and did not mention the defendant, or anyone in his local club. He spoke generally about the incident to explain one group's reaction to another's support gear.

Next, the defendant objects to Katz's testimony defining "associates," in part, as "people that do legal—or illegal things with [members]." The statement was made in the context of describing the general hierarchy and functioning of the organization and Katz made clear that associates are not members, but are affiliated with a group through their social interactions and relationships with members. Here, many witnesses to the incident were social acquaintances of the defendant, whom they knew to be a member of the Outlaws. Thus, if the jury determined that any witness could be considered an "associate," it would have a basis for evaluating that witness's credibility. While Katz did state that "associates" do illegal as well as legal things, he did not mention the defendant or any person the defendant knew. Also, as pointed out by the State, acquaintances of the defendant who were at Three Cousins, and who might have been "associates," admitted that they might have been using illegal drugs that night, though not with the defendant. Therefore, there was already testimony in evidence of illegal activity by social acquaintances of the defendant, which diminished any potential prejudice from Katz's statements.

Finally, the defendant objects to Katz's testimony relating to other incidents of violence that did not involve the defendant. Specifically, he objects to Katz's testimony that "[t]here [have] been homicides where individuals have been killed between the gangs in gang fights. There have been severe beatings, stabbings, assaults. A variety of violence directed against members, and in some cases associates of—of those two organizations." Immediately preceding this statement, however, Katz was asked to explain the "relationship of antagonism" between the Outlaws and Hells Angels. As we have already concluded, the rivalry between these groups was probative as to the defendant's motive to attack a supporter of the Hells Angels. We conclude that its probative value was not substantially outweighed by the danger of unfair prejudice. *See Gonzalez*, 25 Cal. Rptr. 3d at 133.

The defendant contends that even if the above-challenged evidence was probative, the State had other, more pertinent evidence and need not have introduced the objectionable portions of Katz's testimony. As an example, in regard to witness credibility, the defendant argues that Katz testified that witnesses do not want to be involved in cases like this one and it is difficult to get people to cooperate. Thus, there was no need to introduce evidence of the Outlaws' violence and criminal nature. He makes a similar argument regarding the defendant's motive. In light of this alternative evidence, the defendant argues that the challenged evidence was minimally probative and unnecessarily cumulative. *See State v. Watkins*, 148 N.H. 760, 768 (2002) (probative value must be considered in the context of its incremental value and the extent to which the issue is established by other evidence). We do not agree that the evidence was as lacking in probative value as the defendant contends.

Katz's testimony about the violent nature of these groups, and that they lived by their own rules and without regard to society's rules, was evidence not only of why the defendant acted the way that he did, but also why witnesses were not as forthcoming as they might otherwise have been. Had Katz simply testified that the groups were known to be violent or that other people in unrelated incidents might not be cooperative, he would not have given the jury an understanding of the nature of the relationship between the Hells Angels and Outlaws or the degree to which witness intimidation is a factor. We conclude that the challenged evidence was not, as the defendant contends, minimally probative or unnecessarily cumulative, but was highly probative on issues in dispute. Further, had the defendant feared the jury's use of the challenged evidence when he believed other evidence was available, he could have requested a limiting instruction. He did not do so. For the above reasons, we conclude that the probative value of the evidence challenged by the defendant was not substantially outweighed by the danger of unfair prejudice and, therefore, the trial court did not err in admitting it.

*III. Testimony of Detective John Patti*

Finally, in his *pro se* brief, the defendant argues that the trial court erred in admitting certain evidence about Mark McManus. During trial, Detective John Patti of the Manchester Police Department testified that he interviewed McManus the day after the shooting. Patti testified only that McManus was "shaken up" and was "concerned for his safety" during the interview. Patti did not relate any of the substance of McManus' statements. The defendant objected to Patti's testimony on the ground that it constituted hearsay. The defendant now argues that because McManus

died prior to trial, admitting Patti's testimony about McManus violated *Crawford* as well as the rules of evidence.

As to whether Patti's testimony violated *Crawford*, we conclude that the issue has not been preserved. The general rule in this jurisdiction is that a contemporaneous and specific objection is required to preserve an issue for appellate review. *State v. Winstead*, 150 N.H. 244, 246 (2003). The objection must state explicitly the specific ground of objection. *Id.* The sole objection raised during Patti's testimony was that his statements constituted inadmissible hearsay. As neither *Crawford* nor the Confrontation Cause was raised in the trial court as an objection to Patti's testimony, we conclude that the issue has not been preserved.

As to the defendant's argument under the rules of evidence, we review a trial court's decision on the admissibility of evidence under an unsustainable exercise of discretion standard. *State v. Hall*, 152 N.H. 374, 378 (2005). To meet this standard, the defendant must demonstrate that the trial court's rulings were clearly untenable or unreasonable to his prejudice. *Id.*

■■ ■■ The defendant contends that Patti's statements regarding McManus' concerns are inadmissible hearsay. The State counters that Patti's testimony is admissible under the exception to the hearsay rule in New Hampshire Rules of Evidence 803(3). That rule states, in relevant part, that, "A statement of the declarant's then existing state of mind, emotion, sensations, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed" is not excluded by the hearsay rule. N.H. R. EV. 803(3). To be admissible under this exception, the declaration must concern the mental state of the declarant and have reference to the time at which the declaration was made. *Hall*, 152 N.H. at 378. Here, the statements were introduced to show McManus' state of mind at the time he was interviewed by the police, which included concern for his safety. We conclude that the trial court's decision to admit Patti's testimony about McManus' state of mind at the time of his interview was not an unsustainable exercise of discretion.

The defendant argues that even if a general statement of McManus' "concern" was admissible, the statement that he was "concerned for his safety" is not because it expresses a statement of memory or belief to prove the fact remembered. We do not agree. Stating that McManus was merely "concerned" does not explain his state of mind. Concern for one's safety is not the same as, for example, concern about the fates of Denoncourt or the

defendant. In testifying that McManus was concerned for his safety, Patti was relating the then-existing state of McManus' mind. Thus, his testimony falls within the ambit of Rule 803(3).

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.