Cheshire
No. 2011-809

### THE STATE OF NEW HAMPSHIRE

v.

### DAVID MCLEOD

Argued: January 10, 2013
Opinion Issued: May 14, 2013

*Michael A. Delaney*, attorney general (*Janice K. Rundles*, senior assistant attorney general, on the brief and orally), for the State.

*Stephanie C. Hausman*, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. The State appeals orders of the Superior Court (*Wageling*, J.) granting motions of the defendant, David McLeod, to preclude certain expert testimony and to suppress an audio-recording of a one-party telephonic interception, *see* RSA 570-A:6 (2001). We reverse in part, vacate in part, and remand.

*I. Facts and Procedural History*

The following facts are derived from the record. This heretofore "cold" case arises from a fire that occurred at an apartment building in Keene on January 14, 1989. The fire began in the second floor apartment of Sandra Walker. Walker and several other occupants of the building were unharmed by the fire; however, four members of a family living in the building died of smoke inhalation.

On the night before the fire, Ed Bussieres, who lived on the first floor, hosted a party, attended by both Walker and the defendant. Walker left the party between 7 p.m. and 9 p.m. to visit Linda Colburn, a friend who lived nearby. Walker returned from Colburn's apartment between 11 p.m. on January 13 and midnight, and went to her own apartment. Walker drank heavily during the night.

In the early morning hours of January 14, Walker awoke to find flames in her apartment. Over the course of several interviews with Keene police

officers and Fire Investigator Thomas Norton, Walker gave differing accounts as to where she saw flames when she awoke, and how she believed the fire started.

When first interviewed by police, she stated that she assumed she fell asleep with a burning cigarette, and that she awoke to find her bed and the nearby wall completely engulfed in flames. She tried to put out the fire with her hands, but the flames intensified. She stated that she walked to the bathroom, where she filled a coffee pot with water. When she left the bathroom and looked at the bed, however, she "just saw flames." After realizing that she could not put out the fire, she ran out of her apartment. Based, in part, on the initial interviews with Walker, Norton reached the preliminary conclusion that the cause of the fire was "smoking materials."

Thereafter, the Keene Police Department reported that certain witnesses had implicated the defendant in starting the fire. One witness told officers that the defendant said, "How'd I do[?] [M]ake sure you go to the insurance company." Several other witnesses recounted hearing similar statements. Another witness stated that the defendant commented before the fire, "I'm going up to [Bussieres's] to get some coke and torch the place." The defendant denied involvement in the fire.

After receiving this information, Norton and the police again interviewed Walker. A police officer told her that the police suspected the defendant had started the fire. Walker stated that she did not know whether she had been smoking a cigarette but that she rarely smoked in the bedroom. She stated that she saw low flames around the couch, did not remember coughing, and that her eyes were burning a little bit, but not badly. She also said that she barely knew what was going on around her and that she was "very hazy."

Norton went back to the scene, and conducted a "controlled burn test." He applied a flame to a piece of stuffing from Walker's couch, which created so much smoke that he had to stop the experiment after six minutes. Norton ultimately concluded that the fire started on the couch and was the result of an "incendiary act" — that is, that the introduction of an open flame to the couch caused it to ignite. He ruled out the possibility the fire was caused by "smoking materials."

The State then assembled a grand jury for the purpose of investigating the fire. Following the grand jury's investigation, the State did not pursue charges against the defendant.

In 2010, some twenty-one years later, the State's Cold Case Unit reinvestigated the fire. Prior to the initiation of the new investigation, Walker died and some of the evidence related to the fire was lost or destroyed, including the couch. The Cold Case Unit hired two experts from

the United States Alcohol, Tobacco and Firearms Bureau (ATF): Special Agents Andrew Cox and John Pijaca. ATF is the primary federal agency that investigates fire incidents.

Because fire science had changed since 1989, Cox agreed to review and investigate Norton's conclusions. Cox determined that Norton's methodology and conclusions were consistent with the current scientific method outlined in the National Fire Protection Agency's Guide for Fire and Explosion Investigations (NFPA 921), which was developed after 1989. NFPA 921 is the definitive treatise to which fire investigators look in order to comply with the applicable scientific standards of reliability. Cox further concluded that the origin of the fire was the area of the bed and the couch, but could not narrow it to the couch only. He agreed that the fire was caused by a human incendiary act with an open flame, rather than a smoldering cigarette. Pijaca reviewed Cox's opinions and report, and agreed with his conclusions as to the origin and cause of the fire. In July 2010, the defendant was indicted on four counts of second degree murder, *see* RSA 630:1-b, I(b) (2007).

*II. Expert Testimony*

Before trial, the defendant moved to preclude the testimony of Norton, Cox, and Pijaca on the ground that their opinions are based upon Walker's hearsay statements. The defendant argued that Walker's statements were so "vague, ambiguous and inconsistent" as to be an unreliable basis for scientific analysis. The defendant also argued that the State's experts did not apply "accepted scientific methodology in formulating and testing their hypotheses." Finally, the defendant asserted that the opinions were inadmissible pursuant to the Sixth and Fourteenth Amendments to the United States Constitution; Part I, Article 15 of the New Hampshire Constitution; RSA 516:29-a (2007); and New Hampshire Rules of Evidence 402, 403, 702, and 703. The State objected.

The State moved, *in limine*, to admit Walker's statements through the testimony of its experts. The defendant sought to preclude the introduction of Walker's statements, arguing that their introduction would violate his right to confront witnesses against him as guaranteed by the Federal and State Constitutions.

The trial court held evidentiary hearings at which Norton, Cox, and Pijaca testified and were subject to cross-examination. In relevant part, they testified that in arriving at their conclusions as to the cause and origin of the fire, they relied upon: witness statements; reported witness demeanor; physical evidence, such as burn patterns at the scene; field tests; fire studies; and their prior training and experience. They testified that

NFPA 921 requires an investigator to consider witness statements at every step of the investigation, and that it provides that witness interviews are a necessary component of fire investigation. Norton testified that it is common practice in the field to rely upon witness statements.

The experts testified that they took into account Walker's statements and physical condition in ruling out a "smoldering fire" and concluding that the fire resulted from an open flame. According to Norton:

> [I]f the fire were the result of smoking materials[,] it would be expected that Walker would have succ[u]mbed or suffered from smoke inhalation and burns. The reason for this is the advanced stage of burning, for a cigarette fire, she describes. Smoking materials fire starting in a couch stuffed with cotton fib[ers] takes over an hour to erupt into flames. During this time[,] large amounts of smoke and carbon monoxide are produced[,] which would cause injury or death.

Norton conceded on cross-examination that some of Walker's statements were inconsistent.

Following the evidentiary hearings, the trial court issued an order precluding admission of the State's experts' opinions and Walker's statements. The trial court did *not* rule that the experts improperly relied upon Walker's statements under the Rules of Evidence or NFPA 921. Instead, it concluded that "[b]ecause the experts' opinions were not independent from Walker's testimonial statements, allowing the experts to testify about the statements would violate the [d]efendant's [Confrontation Clause] rights." The trial court reasoned that without Walker's statements, the defendant could not engage in a threshold level of inquiry of the experts, and in order to "get to the heart" of the experts' statements' accuracy and reliability, the "[d]efendant [would] be placed in an untenable position of having to introduce the statements himself." The court found that without Walker's statements, the experts lacked sufficient facts or data to support their conclusions, as required by the Rules of Evidence and RSA 516:29-a, I(a).

Pursuant to RSA 606:10 (2001) (permitting certain appeals by the State in criminal cases), the State appealed the trial court's ruling. The State argues that the trial court erred by concluding that allowing its experts to testify would violate the defendant's rights to confrontation, and by also finding the experts' opinions inadmissible under the New Hampshire Rules of Evidence and RSA 516:29-a. We review Confrontation Clause challenges *de novo. State v. Brooks*, 164 N.H. 272, 278 (2012). Because the parties' arguments center on the defendant's rights under the Federal Constitution, we first address the State's arguments under the Federal Constitution. *Id.* at 278-79.

■ The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States." *Michigan v. Bryant*, 131 S. Ct. 1143, 1152 (2011). "Only [testimonial] statements . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). A statement in response to interrogation is "testimonial" when circumstances indicate "that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. Here, the State concedes that Walker's statements are testimonial.

■ The State may admit against a defendant the "testimonial statements" of an absent witness only when the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004). Here, the defendant did not have an opportunity to cross-examine Walker before her death; thus, her statements may not be entered by the State substantively against the defendant. *See id.*

The State advances a two-part argument. First, it asserts that Walker's testimonial statements are admissible through the experts' direct examinations because they will be offered only to explain the bases of the experts' opinions, and not for the "truth" of the statements. Alternatively, the State argues that if Walker's statements are not admissible through the experts' direct examinations, the experts may nonetheless offer their opinions, and the defendant is free to challenge those opinions on cross-examination, even if such challenge involves eliciting Walker's statements.

As to the first part of its argument, the State cites *Crawford*, in which the Supreme Court noted, "The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 60 n.9. The State also cites several cases in which courts have relied upon this statement to conclude that testimonial statements admitted to support an expert's conclusions are not offered to establish the truth of the assertions in the statements and, thus, do not violate a defendant's right to confrontation. *See, e.g., United States v. Pablo*, 625 F.3d 1285, 1291-92 (10th Cir. 2010), *judgment vacated by Pablo v. United States*, 133 S. Ct. 56 (2012).

We reject this argument in light of the Supreme Court's recent opinion in *Williams v. Illinois*, 132 S. Ct. 2221 (2012). In *Williams*, a plurality of the Court upheld the admission of expert testimony that the defendant's DNA profile matched a similar DNA profile generated by a non-testifying scientist. *See id.* at 2228-31. The plurality concluded that the testimonial

evidence was used to support the expert's opinion and not for the truth of the matter asserted. *Id.* at 2235-36. Justice Thomas, however, in his concurring opinion, and the four dissenting Justices rejected the plurality's rationale that evidence supporting the basis of an expert's opinion is not offered for its truth. *See id.* at 2256-57, 2268-70. The dissent explained:

> The situation could not be more different when a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion, because the statement's utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such "basis evidence" comes in not for its truth, but only to help the factfinder evaluate an expert's opinion "very weak," "factually implausible," "nonsense," and "sheer fiction."

*Id.* at 2268-69 (Kagan, J., dissenting) (quoting D. KAYE ET AL., THE NEW WIGMORE: A TREATISE ON EVIDENCE: EXPERT EVIDENCE § 4.10.1, at 196-97 (2d ed. 2011)); *see* KAYE ET AL., *supra* § 4.11.6, at 24 (Supp. 2012); *see also State v. Navarette*, 294 P.3d 435, 439-40 (N.M. 2013) (reading *Williams* to support the principle "that an out-of-court statement that is disclosed to the fact-finder as the basis for an expert's opinion is offered for the truth of the matter asserted"). Thus, we agree that the defendant's confrontation rights would be violated were the State permitted to introduce Walker's statements through the direct examination of its experts. *See Williams*, 132 S. Ct. at 2268-69.

The State's alternative argument, however, stands on a different footing. The State contends that merely because a witness's testimonial statements are not admissible on direct examination does not mean that the expert's opinion should be excluded. Rather, so long as the expert can proffer a relevant opinion, "the expert's ability to recount the underlying basis for his or her opinion [can be] circumscribed." We agree.

■ As a preliminary matter, the defendant maintains that the State waived this argument below. The purpose of our preservation requirement is to ensure that the trial court is made aware of the substance of an objection and thus given an opportunity to correct the asserted error. *State v. Fischer*, 143 N.H. 311, 318 (1999). Here, the trial court stated, "The State appears to argue that it will achieve [its] purpose by not introducing [Walker's statements] in its case in chief." The trial court then addressed the State's argument. Thus, we are satisfied that the State has preserved the argument for review.

■This case illuminates the intersection of the right to confrontation and the parameters of permissible expert testimony. New Hampshire Rule of Evidence 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Further, "[t]he expert may testify in terms of opinion or inference and give reason therefor without prior disclosure of the underlying facts or data." N.H. R. Ev. 705. Frequently, "facts or data" relied upon by experts will qualify as "testimonial statements" under *Crawford*. The import of those statements on the opinions of experts, however, requires a different analysis than that applicable to lay witnesses. *Crawford* prohibits lay witnesses from simply relating the testimonial statements of an unavailable declarant. *See Crawford*, 541 U.S. at 68. *Crawford* does not, however, offer guidance on the question of the extent to which an expert may rely on testimonial statements of unavailable declarants.

Since *Crawford*, the United States Supreme Court has considered the extent to which an expert, in rendering an opinion, may testify about "testimonial statements" of others. In *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2710 (2011), the defendant was arrested for driving while under the influence of liquor (DWI). A sample of the defendant's blood was drawn and sent to the New Mexico Department of Health, Scientific Laboratory Division. *Id.* One of the analysts at the laboratory, Curtis Caylor, prepared a report and certified his finding that the defendant's blood alcohol content (BAC) was .21. *See id.* at 2710-11. A second analyst reviewed Caylor's analysis and certified that Caylor was qualified to conduct the BAC test and that he followed laboratory procedures. *Id.* at 2711.

The State used Caylor's report to support an aggravated DWI prosecution. *Id.* However, at trial the State did not call Caylor; rather, the State introduced the report through a third analyst "who had neither observed nor reviewed" Caylor's analysis. *Id.* at 2712. The Court concluded that entering the report through this analyst violated the defendant's right to confrontation. *Id.* at 2716-18. It rejected the argument that the testifying analyst should be permitted to convey Caylor's opinion because he was knowledgeable as to the laboratory procedures. *See id.* at 2715. It found the "surrogate testimony" impermissible because such testimony could not attest to what Caylor knew or observed; nor could it "expose any lapses or lies on the certifying analyst's part." *Id.*

*Bullcoming's* guidance as to the permissible scope of expert testimony, however, is limited: the Court in *Bullcoming* held only that admitting a testimonial certification through "surrogate testimony" of another expert violates the Confrontation Clause. *See id.* at 2710. *Bullcoming* is noteworthy, however, not only for the rule it provides, but also for the factual circumstances it did *not* address. In her concurrence, Justice Sotomayor "emphasize[d] the limited reach of the Court's opinion," *id.* at 2719 (Sotomayor, J., concurring), and listed some of the factual circumstances "that th[e] case did *not* present." *Id.* at 2722. In relevant part, she stated, "[T]his is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* She wrote further, "We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." *Id.*

That is the question before us here: to what extent may the State's experts rely upon Walker's unadmitted testimonial statements in rendering their own opinions as to the cause and origin of the fire? Although the plurality in *Williams* stated that it was confronting this question, *see Williams*, 132 S. Ct. at 2233, it did not, in fact, do so. Rather, in *Williams*, the substance of the report prepared by the non-testifying scientist *was* admitted into evidence during the direct examination of the testifying expert. *See id.* at 2229-30, 2236. The plurality concluded that admission of the evidence did not constitute a Confrontation Clause violation for two independent reasons: the evidence was not introduced for its truth, *id.* at 2236, 2239-40; and the primary purpose of the report was not to accuse a particular individual or to create evidence for use at trial, *see id.* at 2242-44. Thus, *Williams* is not helpful on this issue. *See State v. Kennedy*, 735 S.E.2d 905, 922 (W. Va. 2012) (finding *Williams* "a tenuous and highly distinguishable opinion which does not, with majority support, dispense with the issue of to what extent a[n] . . . expert may 'rely' upon testimonial hearsay"). Nor have we had occasion to address the issue. *But see State v. Dilboy*, 163 N.H. 760, 766-67 (2012) (stating, in dicta, that if the expert's statements at trial about test results were based upon his own review of raw data, "his statements may not have been a violation of the Confrontation Clause," and that the admission of his "statements would violate the Confrontation Clause only if he recited the statements of a non-testifying witness, rather than his own opinions or conclusions based upon his review of the raw data").

Other courts, however, have squarely addressed the issue. In *United States v. Johnson*, "the government . . . intercepted telephone calls between various members of [a] drug conspiracy." *United States v. Johnson*, 587

F.3d 625, 633 (4th Cir. 2009). To help interpret the calls, the government called expert witnesses who had extensive training and experience in drug trafficking. *Id.* at 633-34. The experts testified that "several seemingly innocuous terms . . . were actually code words for narcotics," *id.* at 634, and that they were able to decode the "conversations by looking for unusual patterns of speech," *id.* (quotation and brackets omitted). One expert explained that he based his conclusions upon the context of the conversations, the known nature of the organization, informant information, and other seized evidence. *Id.*

The defendant in *Johnson* argued that allowing the experts to provide opinions based upon testimonial statements of others violated his rights under the Confrontation Clause. *See id.* After assuming that the statements relied upon by the experts were testimonial, *see id.* at 635, the court held that there was no Confrontation Clause violation because the "expert witnesses present[ed] their own independent judgments, rather than merely transmitting testimonial hearsay, and were subject to cross-examination," *id.* at 636. The court explained:

> An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the [expert] witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion would provide an end run around *Crawford*. For this reason, an expert's use of testimonial hearsay is a matter of degree. The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination.

*Id.* at 635 (quotations and citations omitted). The court further noted:

> [E]xpert witnesses play a valuable role in our criminal justice system. As recognized in Federal Rule of Evidence 702, experts often assist the trier of fact to understand the evidence or to determine a fact in issue. To better fulfill this role, experts are permitted to consider otherwise inadmissible evidence as long as it is of a type reasonably relied upon by experts in the particular

field. Some of the information experts typically consider surely qualifies as testimonial under *Crawford*. Were we to push *Crawford* as far as [the defendant] proposes, we would disqualify broad swaths of expert testimony, depriving juries of valuable assistance in a great many cases.

*Id.* (quotations and citation omitted); *see also, e.g., United States v. Ramos-González*, 664 F.3d 1, 5 (1st Cir. 2011) ("[T]he assessment is one of degree. Where an expert witness employs her training and experience to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal."); *United States v. Williams*, 740 F. Supp. 2d 4, 9-10 (D.D.C. 2010) (expert may testify to "independent judgment" that is "reached by application of [the expert's] training and experience to" testimonial evidence (quotation omitted)); *State v. Gonzales*, 274 P.3d 151, 159 (N.M. Ct. App. 2012) ("An expert's testimony may be based on inadmissible evidence, and until such expert testimony crosses the line from the formation of an independent opinion based on underlying raw data to a reliance on the conclusions and opinions of the author of the autopsy or a mere parroting of the report's findings, then that testimony is admissible subject to the rules of evidence."); *State v. Manion*, 295 P.3d 270, 273 (Wash. Ct. App. 2013) ("[A] testifying expert may base his or her opinion on a nontestifying expert's testimonial statement, so long as the testifying expert has exercised independent judgment."); *Kennedy*, 735 S.E.2d at 922.

██ We agree with the proposition that the Confrontation Clause is not violated when an expert testifies regarding his or her independent judgment, even if that judgment is based upon inadmissible testimonial hearsay. We conclude that this approach strikes the proper balance between a defendant's confrontation rights and the valuable role expert testimony plays in a criminal trial. Thus, here, we must determine whether the State's experts have applied their "own training and experience" to Walker's statements or have acted merely as "transmitter[s] for testimonial hearsay." *Johnson*, 587 F.3d at 635.

Citing *Johnson*, the trial court stated that "it is helpful . . . to also consider the degree of an expert's reliance on the testimonial statements of another as a spectrum." It then stated, however, that on one end of the spectrum are "testimonial statements [that] are nothing more than technical test data or machine readouts," and on the other end "are testimonial statements which require so much subjective knowledge and observation that they are fraught with error and bias." The trial court concluded that "[i]f . . . the experts' opinions can be explained in a manner that is

*independent from* the subjective observations and potential bias of another, then they comply with the requirements of the Confrontation Clause." (Emphasis added.)

 The trial court misconstrued *Johnson* and erred in its analysis for two reasons. First, it did not address the extent to which the experts' opinions resulted from the exercise of independent judgment based upon training and experience; rather, it focused upon the reliability of the underlying testimonial statements. However, the Supreme Court's Confrontation Clause jurisprudence under the Federal Constitution forecloses an analysis in which some forms of testimonial hearsay are considered more inherently reliable than others. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 317-18 (2009) (rejecting any distinction, for Confrontation Clause purposes, between testimony that is the "result of neutral, scientific testing" and testimony that recounts "historical events"). *But see State v. Ata*, 158 N.H. 406, 409 (2009) (noting that we have not adopted *Crawford* under our State Constitution and, thus, applying the "indicia of reliability test" set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980)).

 Second, the question is not whether an expert can explain his opinion in a manner that is *independent from* testimonial statements; rather, it is whether the expert brings his own independent judgment to bear on the facts before him. *See Johnson*, 587 F.3d at 635. So long as the expert applies "his training and experience to the sources before him and reach[es] an *independent judgment*, . . . [t]he expert's opinion will be an original product that can be tested through cross-examination," and thus will not violate a defendant's rights under the Confrontation Clause. *Id.* (emphasis added).

 "[T]he reconciliation of *Crawford, Melendez-Diaz*, and *Bullcoming* — which forbid the introduction of testimonial hearsay as evidence in itself — with Rule 703, which permits expert reliance on otherwise inadmissible testimonial hearsay . . . necessarily involve[s] a case-by-case assessment as to the quality and quantity of the expert's reliance." *Ramos-González*, 664 F.3d at 5. Here, we conclude that the State's experts have each applied their independent judgment to Walker's statements and that they are not acting as mere "transmitters" of testimonial hearsay. Norton relied upon several types of evidence in reaching his conclusions, including physical evidence from the scene and field tests, as well as witness interviews. Norton testified that it is common practice in the fire science field to rely upon witness statements. Further, although Norton assumed the truth of Walker's statements, in reaching his opinions, he also considered the fact that she was unharmed, and applied his knowledge of fire science and his experience.

Cox and Pijaca also relied upon several types of evidence, including physical evidence and fire studies, as well as Walker's statements and the statements of other witnesses. Cox testified that NFPA 921 specifically requires fire experts to consider witness statements.

Further, it is apparent that the experts reached their own independent conclusions based upon the facts disclosed by the prior investigation. Walker's statements have little significance as to the cause and origin of the fire in the absence of the experts' knowledge of fire science. For example, Walker's statements that she was able to see across the room and did not experience much coughing take on significance only when coupled with the experts' knowledge that smoldering fires (*e.g.*, fires caused by "smoking materials") produce substantial amounts of smoke before turning to flame. Because the experts have applied their own knowledge to the facts before them, they are not acting as mere "transmitters" of testimonial statements of others, including Walker; rather, they are "true expert[s] whose considered opinion[s] shed[ ] light on [a] specialized factual situation." *Johnson*, 587 F.3d at 635. Thus, the Confrontation Clause does not prohibit them from testifying regarding their opinions, so long as they do not testify as to Walker's statements on direct examination. *See Commonwealth v. Barbosa*, 933 N.E.2d 93, 106-07 (Mass. 2010) (prosecution's expert is limited on direct examination to "the expert's opinion and matters of which the expert has personal knowledge"; on cross-examination, defendant can "open the door . . . to testimony regarding the basis for the expert's opinion"), *cert. denied*, 131 S. Ct. 2441 (2011); *see also* N.H. R. Ev. 705.

■ The defendant argues that without the introduction of Walker's statements, the experts would be providing only meaningless conclusions to the jury and, thus, their testimony would be more prejudicial than probative. *See* N.H. R. Ev. 403. We disagree. Our holding — disallowing "basis evidence" in the form of testimonial statements of an unavailable witness on direct examination of a State's expert, but allowing a defendant to explore those statements on cross-examination — is based upon well-established legal principles. *See, e.g., Barbosa*, 933 N.E.2d at 106-07; *see also Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 418 (2004). Further, this is precisely the scenario addressed by New Hampshire Rule of Evidence 705: "[An] expert may testify in terms of opinion or inference and give reason therefor without prior disclosure of the underlying facts or data . . . . The expert may . . . be required to disclose the underlying facts or data on cross-examination." *See also* N.H. R. Ev. 703 (data underlying expert opinion need not be admissible). Here, the experts may testify, on direct examination, that they relied upon witness statements, among other evidence, in reaching their conclusions. *See United States v. Henry*, 472

F.3d 910, 914 (D.C. Cir. 2007) (noting that *Crawford* "did not alter an expert witness's ability to rely on (without repeating to the jury) otherwise inadmissible evidence in formulating his opinion"); *State v. Huettl*, 305 P.3d 956, 966 (N.M. Ct. App. 2012) ("What has emerged as clearly permissible under the Confrontation Clause and under the Federal Rule of Evidence 703 . . . is expert, scientific testimony based upon facts or data of which the expert has been made aware, even when those facts or data would otherwise be inadmissible, provided that the expert testifies only to his or her own, independently derived conclusions."), *cert. granted*, 300 P.3d 1182 (N.M. March 1, 2013). The defense can explore the basis of those conclusions on cross-examination in whatever detail it deems useful to impeach them. *See Barbosa*, 933 N.E.2d at 106-07.

 The defendant argues that allowing the experts to testify on direct examination regarding their opinions without testifying as to Walker's statements puts him in the untenable position of choosing between his right to cross-examine the experts and his right to confront Walker. We disagree. If offered on direct examination, the testimonial statements could only be understood as being offered for their truth. *See Williams*, 132 S. Ct. at 2268-69 (Kagan, J., dissenting). On cross-examination, elicitation of Walker's statements would be for the purpose of impeaching the experts' opinions. *Cf. United States v. Hudson*, 970 F.2d 948, 956 (1st Cir. 1992) ("Impeachment evidence . . . is admitted not for the truth of the matter asserted but solely for the fact that the witness' trial testimony is less believable."). Because, on cross-examination, Walker's statements would not be offered for their truth, the Confrontation Clause is not violated. *See Crawford*, 541 U.S. at 60 n.9; *cf. Barbosa*, 933 N.E.2d at 106 ("A defendant . . . cannot reasonably claim that his right to confront the witnesses against him is violated by the admission of evidence that he elicits on cross-examination.").

 Even if introduction of Walker's testimonial statements on cross-examination is "forced" upon the defendant, we do not conclude that the defendant's rights are thereby violated. "The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow." *State v. Williams*, 115 N.H. 437, 442 (1975) (quotations omitted). "Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token forbid requiring him to choose." *Id.* (quotation omitted). "The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Id.* (quotation omitted).

The purpose behind the Confrontation Clause is to "secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (emphasis omitted). "The Confrontation Clause was designed to root out the 'principal evil' of using '*ex parte* examinations as evidence against the accused.'" *Peak v. Webb*, 673 F.3d 465, 478 (6th Cir. 2012) (quoting *Bryant*, 131 S. Ct. at 1152). In the context of expert testimony, the Confrontation Clause is meant to prohibit experts from acting merely as transmitters of the testimony of others. *See Johnson*, 587 F.3d at 635. This purpose is not compromised by the defendant's choice, "forced" or otherwise, to elicit underlying testimonial statements through an expert witness who is not acting as a mere transmitter of testimonial hearsay. *See id.* When an expert renders his own independent judgment as to the significance of others' testimonial statements, "[t]he expert's opinion will be an original product that can be tested through cross-examination." *Id.*; *see also Barbosa*, 933 N.E.2d at 107-08.

Based upon the foregoing, we hold that the trial court erred in ruling that to allow the State's experts to testify regarding their opinions would violate the defendant's rights under the Confrontation Clause to the Federal Constitution. We, therefore, reverse that ruling.

The trial court also ruled that the defendant's rights under the State Constitution are co-extensive with his rights under the Federal Constitution. Thus, it analyzed only Sixth Amendment cases, including *Crawford*, in finding a violation of the State Constitution. Because we have found no federal constitutional violation, the trial court's finding of a state constitutional violation, based upon federal jurisprudence, must necessarily be vacated. We note that "we have not adopted, and neither party argues that we should adopt, *Crawford* as applicable to claims under the State Constitution." *State v. Legere*, 157 N.H. 746, 750 (2008). Nor have the parties "address[ed] the applicability of the Confrontation Clause test we have adopted — namely, that of *Ohio v. Roberts*, 448 U.S. 56 (1980)." *Brooks*, 164 N.H. at 282.

As a final matter, the trial court found that allowing the experts to testify would violate not only the defendant's rights to confrontation, but also RSA 516:29-a, as well as Rules of Evidence 403, 702 and 703. Because this ruling was based entirely upon the trial court's mistaken conclusion that the experts' opinions had to be "independent from" Walker's statements, we vacate it and remand for reconsideration in light of this opinion. We note that the trial court did not address the defendant's challenges to the State's experts' scientific methods and principles. Accordingly, we make no ruling as to those issues.

### III. One-Party Telephonic Interception

The State argues that the trial court erred by excluding a recording of a one-party consensual telephonic interception (one-party intercept) conducted on January 3, 2002. In late 2001, Kurt Frazier, who knew the defendant in 1989, came forward with additional information about the fire. Thereafter, Senior Assistant Attorney General Simon Brown scheduled a one-party intercept for January 3, 2002. On January 3, 2002, Keene police intercepted a telephone call made by Frazier, who was at the Keene Police Department, to the defendant, who was in California. Brown orally authorized the intercept for the time period between 6:30 p.m. on January 3, 2002, and 12:00 a.m. on January 4, 2002. Frazier spoke with the defendant between the authorized hours, and their conversation was recorded.

Both before and during the conversation, Brown made handwritten notes. The notes reference the statements made by Frazier to the authorities that the defendant admitted to lighting Walker's couch on fire. The notes also document that there were two attempts to contact the defendant: one at 6:40 p.m., which was unsuccessful; and the other at 7:14 p.m., at which time Frazier spoke with the defendant. During the course of the conversation, the defendant appeared to become suspicious, and he did not provide any information. Six days later, on January 9, 2002, Brown prepared a formal memorandum setting forth the basis for his determination that reasonable suspicion existed to authorize the one-party intercept.

The defendant moved to suppress all evidence related to the intercept. The defendant argued, among other things, that suppression was required because the State did not make a written memorandum of its reasonable suspicion determination within seventy-two hours following the oral authorization, as required under RSA 570-A:2, II(d) (2001). The trial court granted the defendant's motion to suppress the recording of the intercept, and the State appeals that ruling.

Pursuant to RSA chapter 570-A, New Hampshire's wiretapping statute, it is generally unlawful for any person to "[w]ilfully intercept[ ] . . . any telecommunication or oral communication" without the consent of all parties to the communication. RSA 570-A:2, I(a) (2001). However, it is not unlawful for:

> An investigative or law enforcement officer in the ordinary course of the officer's duties pertaining to the conducting of investigations of . . . offenses enumerated in this chapter . . . to intercept a telecommunication or oral communication, when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception;

provided, however, that no such interception shall be made unless the attorney general, the deputy attorney general, or an assistant attorney general designated by the attorney general determines that there exists a reasonable suspicion that evidence of criminal conduct will be derived from such interception.

RSA 570-A:2, II(d). The statute provides that if oral authorization is given, "a written memorandum of [the reasonable suspicion] determination and its basis shall be made within 72 hours thereafter." *Id.* A person is guilty of a misdemeanor if "the person knowingly intercepts a telecommunication or oral communication when the person is a party to the communication or with the prior consent of one of the parties to the communication, but without the approval required by RSA 570-A:2, II(d)." RSA 570-A:2, I-a (2001). The statute also contains an exclusionary provision, which states, "Whenever any telecommunication or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of [RSA chapter 570-A]." RSA 570-A:6.

The trial court suppressed the State's recording of the intercept because it found that the State violated RSA 570-A:2, II(d) by failing to file a written memorandum setting forth a determination of reasonable suspicion and its basis within seventy-two hours following the intercept. The State challenges the trial court's ruling on three grounds, asserting that: (1) Brown's handwritten notes made contemporaneously with the intercept constitute a "written memorandum" satisfying RSA 570-A:2, II(d); (2) intercepted recordings obtained pursuant to RSA 570-A:2, II(d) are not subject to the statute's exclusionary provision; and (3) even if the exclusionary remedy applies to intercepts that do not comply with RSA 570-A:2, II(d), the State's failure to timely file a memorandum constitutes a "technical violation" only, which should not result in suppression.

We assume, without deciding, that Brown's handwritten notes do not qualify as a "written memorandum" under RSA 570-A:2, II(d) and that RSA 570-A:6 applies to intercepts authorized under RSA 570-A:2, II(d). We nonetheless conclude that the State's failure to timely file its written memorandum does not require suppression of the recording.

Whether RSA chapter 570-A precludes disclosure of the contents of an intercepted communication presents an issue of statutory interpretation. *See State v. MacMillan*, 152 N.H. 67, 70 (2005). In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. *Id.* We first examine the language of the statute and ascribe the plain and ordinary meanings to the

words used. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.* If the statute's language is clear and unambiguous, we do not look beyond the language of the statute to discern legislative intent. *Id.*

■ RSA 570-A:6 requires suppression only "if the *disclosure* of [evidence derived from the intercept] would be in violation of [the] chapter." (Emphasis added.) The legislature, pursuant to RSA 570-A:2, I(c) and (d), has expressly set forth the circumstances under which the disclosure or other use of the contents of an intercept violates the chapter: a violation occurs when the information is "obtained" in violation of RSA 570-A:2. *See* RSA 570-A:2, I(c), (d). Thus, as long as the intercepted information is obtained lawfully under the chapter, RSA 570-A:6 does not require suppression. *See* RSA 570-A:6; *see also* RSA 570-A:9, IX(a) (2001) (suppression warranted when "[t]he communication was unlawfully intercepted," "[t]he order of authorization or approval . . . is insufficient," or "[t]he interception was not made in conformity with the order of authorization or approval").

Under RSA 570-A:2, II(d), a law enforcement officer, in the course of conducting an investigation of offenses enumerated under the chapter, may intercept communications as long as either the officer "is a party to the communication or one of the parties to the communication has given prior consent to such interception." RSA 570-A:2, II(d). However, before the officer may conduct an intercept, the attorney general or the attorney general's designee must determine that there is reasonable suspicion that evidence of criminal conduct will be derived from the intercept. *Id.* Authorization may be given in writing or orally. *See id.*

■ Here, the State obtained the intercepted information lawfully under RSA 570-A:2, II(d). There is no dispute on appeal that the State was investigating one of the offenses enumerated under the chapter, that Frazier consented to the intercept, and that Brown orally authorized the intercept based upon reasonable suspicion that evidence of criminal conduct would be derived from the intercept; the trial court did not find otherwise. Under these circumstances, we cannot conclude that the State's three-day delay in meeting the *post-intercept* written memorandum requirement vitiates the lawfulness of the intercept. Because the intercept was "obtained" lawfully under the chapter, RSA 570-A:6 does not require suppression. *Cf. United States v. Chavez*, 416 U.S. 562, 575 (1974) (finding

that, under federal wiretapping law, suppression is mandated only if "disclosure" would violate the law). Accordingly, we reverse the trial court's suppression order.

*Reversed in part; vacated in part; and remanded.*

DALIANIS, C.J., and HICKS, LYNN and BASSETT, JJ., concurred.