IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 24, 2026 Session[1]

**STATE OF TENNESSEE v. WESLEY ALLEN LACEY**

**Appeal from the Criminal Court for Knox County**
**No. 123628   Steven Wayne Sword, Judge**

_____

**No. E2025-00295-CCA-R3-CD**

_____

Wesley Allen Lacey, Defendant, was charged in a presentment by the Knox County Grand Jury with one count of second degree murder and one count of delivery of fentanyl in an amount less than fifteen grams.  A jury found Defendant guilty of second degree murder and casual exchange.  As a result, he was sentenced to fifteen years to be served at 100% for the second degree murder conviction and eleven months and twenty-nine days for the casual exchange conviction, to be served concurrently, for a total effective sentence of fifteen years in incarceration.  After the denial of a motion for new trial, Defendant appealed challenging the sufficiency of the evidence to support the conviction for second degree murder and the admission of testimony from a medical examiner who did not perform the autopsy of the victim.  Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Gerald L. Gulley, Jr. (on appeal); and Michael T. Cabage (at trial) Knoxville, Tennessee, for the appellant, Wesley Allen Lacey.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Greg Eshbaugh and Teddy Ryan, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

---

[1]Oral argument was heard in this case at the Winston College of Law, on the campus of the University of Tennessee Knoxville.

After the April 2022 death of the victim, Cierra Lacey, Defendant was charged in a presentment by the Knox County Grand Jury for one count of second degree murder and one count of delivery of fentanyl in an amount less than fifteen grams. At trial, the following proof was introduced. Defendant and the victim were married. The victim had two children. The victim's mother, Christy Collins, described the victim as a person who suffered from "addiction for quite a while" but testified that the victim was sober when she died. On March 31, 2022, Ms. Collins bonded the victim out of the Grainger County Jail "because the trial kept getting delayed." The victim suffered from "some psychosis" while in jail. The victim went home with Ms. Collins but left the next day to meet Defendant "to relay a message to him."

The victim returned to Ms. Collins's home later that day, "visibly using something." The victim admitted that she was using "H"[2] and "began to cry." Ms. Collins did not want to "enable" the victim, so she did not allow the victim to stay. On April 2 around 9:41 a.m., Ms. Collins received a voicemail notifying her that the victim was in the hospital suffering from cardiac arrest. She spoke with Defendant on the phone. In the phone call, Defendant told Ms. Collins she was "right" that he "did give her more. That morning." Defendant admitted in the phone call that he gave the victim more drugs on the day she died. Defendant told Ms. Collins that the victim took "the same thing, fentanyl." Defendant told Ms. Collins that on the morning the victim died, Defendant put some drugs on the sink. The victim told him that was not enough and she wanted more. Defendant told Ms. Collins that he had "seen her take a lot more than what [he] gave [her]." Defendant "put some more [drugs] out there because that's what [the victim] asked [him] to do." Defendant admitted he "made a mistake" but claimed the victim "asked" for the drugs. Defendant told Ms. Collins he got the drugs from "Redneck's from this dude named Fred."

Detective Jeff Neely of the Knox County Sheriff's Office was assigned to the Narcotics and Major Crimes Unit to investigate overdose deaths. He interviewed Defendant in connection with the victim's death. In the interview, Defendant admitted that the day before the victim got out of jail, he bought "half a point" at "Redneck's" from "Fred." Defendant described both Fred and Redneck as his regular dealers but acknowledged that he knew there were three people who overdosed and died at Redneck's house. Defendant explained that he wanted the victim to stay in jail while she was "coming off the fentanyl" because she was "trying one more time to get clean." According to Defendant, when the victim "tried to come off of this stuff, she went mentally out there."

When the victim got out of jail, she called Defendant and asked him to get some food and take it to the park. After they ate the food, the victim told Defendant her teeth

---

[2] "H" referred to heroin.

hurt. She asked Defendant if he had any "medicine." Defendant admitted he had a "little bit." The victim asked for some. Defendant explained that he and the victim had done drugs together for "forever." He watched the victim take a "half-gram shot." The victim snorted it and ten minutes later was "really messed up." The victim was a "hard-core heroin addict[,]" and Defendant had not seen her react this way before.

The victim told Defendant she needed to go to Ms. Collins's house. The victim dropped Defendant off but called him an hour later and told him that Ms. Collins kicked her out of the house because she was using drugs. The victim asked Defendant to get a hotel room. Defendant got a room and took the "point" of drugs he had left to the hotel. Defendant did not take Narcan with him because he did not plan to give the victim any drugs.

The next morning, the victim told Defendant her teeth were hurting again. She asked Defendant if he had "anything." Defendant admitted he had drugs with him but did not want to give her anything because of her reaction at the park. The victim told Defendant it would be okay because she had not taken her Haldol that morning. Defendant agreed and put a "little bit" of drugs on the bathroom sink. The victim told Defendant it was not "enough." Defendant gave the victim more drugs. They both took drugs and lay down.

The "next thing" Defendant knew, the victim was shaking in the bed. She vomited in her sleep, and Defendant called 911 and tried to give the victim mouth-to-mouth and CPR. Defendant did not know how to perform CPR. The fire truck arrived first, and Defendant informed the first responders who arrived to give the victim Narcan because she was overdosing. The first responder declined because the victim did not look like she was overdosing. When the ambulance arrived, emergency personnel started doing chest compressions.

Defendant did not go immediately to the hospital. He went home to change out of the clothes he was wearing because they were covered in the victim's vomit. Defendant called Ms. Collins after he changed clothes. When Defendant got to the hospital, the victim was dead. Likewise, by the time Ms. Collins arrived at the hospital, the victim was deceased.

Defendant exited the hospital and saw the victim's father, who commented, "It was that damn fentanyl, wasn't it?" Defendant replied, "Yeah, I guess that's what it was. . . ." Defendant said that the victim "always called it heroin" but "they don't say heroin no more. I think all of it's fentanyl." In his interview, Defendant said he thought he was buying heroin but that it "didn't smell like vinegar, so [he] kinda figured it was fentanyl." When Defendant was asked if he was okay with receiving fentanyl, he replied, "[Y]eah, we both

were. I mean that was something we'd get on the regular. You know, it wasn't nothing, it wasn't nothing new to either one of us."

Detective Neely testified that in his job he supervised hundreds of controlled drug buys, that the majority of drugs sold as heroin were fentanyl, and that eighty-one percent of the overdose deaths he investigated involved fentanyl. Detective Neely explained that heroin smells like vinegar.

Dr. Lauren Havrilla, an assistant medical examiner with the Knox County Regional Forensic Center and an expert in forensic pathology, testified that she reviewed "the autopsy report and the toxicology report, along with a printed copy of the investigative report" in the death of the victim. She did not perform the autopsy herself; rather, the autopsy had been performed by Dr. Travis Danielsen. The parties stipulated to the introduction of a toxicology report, acknowledging that the substances found in the report were "not due to [Defendant] modifying the drugs he provided to [the victim] by lacing, cutting, diluting, missing, combining, or otherwise altering the drugs." Counsel for Defendant objected to the introduction of Dr. Havrilla's testimony, arguing that he should be able to cross-examine the doctor who performed the autopsy. The trial court overruled the objection after asking Dr. Havrilla if her "ability to review the findings of the previous doctor was sufficient to be able to make the expert opinion as [Dr. Danielsen] would have given?" Dr. Havrilla explained her "opinion as to the cause of [the victim's] death [wa]s fentanyl and xylazine toxicity." She described fentanyl as "a synthetic opioid" that acts "as a respiratory depressant" and xylazine as "an animal tranquilizer" increasingly found as an adulterant that causes "sedation," "hypotension," and "bradycardia," thereby further impairing the brain's response to hypoxia.

Dr. Havrilla testified that Ms. Lacey's femoral blood contained fentanyl at 19 ng/mL, "an elevated level," noting that "usually around three is the lowest that we see" in fatal overdoses. The sample also showed xylazine at 12 ng/mL, which she characterized as "a relatively low level" but one that contributes to central nervous system depression. The report reflected norfentanyl, indicating metabolism of fentanyl, and 4-ANPP, "a precursor in the illicit manufacturing of fentanyl," signifying the fentanyl was illicitly produced. Naloxone (Narcan) was present, consistent with resuscitation efforts.

Turning to autopsy observations recorded by Dr. Travis Danielsen, Dr. Havrilla acknowledged his notation that "complications of intravenous drug use" contributed to death and that the right ventricle was dilated. However, she disagreed with the significance of those findings. In her words: "Based on his written documentation and his observation as to the size of [the victim's] heart, I do not feel that it would have contributed in a significant way. The levels of drugs present are enough to have killed her with or without other underlying disease." Dr. Havrilla added that the recorded heart weight was "360,

- 4 -

which is a fairly normal size," and testified there was "no evidence that there was other underlying disease in the heart at the time of death."

As to the manner of death, Dr. Havrilla explained the standard classification for overdoses: "In this case, as an overdose death with toxicological causes, we manner those as accidents because someone ingesting a substance . . . might not know what exactly is in there or how much of the drug is in that specific thing they're taking." During her testimony, the trial judge asked a clarifying question—"If the fentanyl had not been present, would the level of xylazine been sufficient to cause her death?"—to which Dr. Havrilla answered plainly, "Yes." On redirect, she confirmed that the amount of fentanyl in the victim's system was "most likely" alone enough to kill her.

On cross-examination, counsel for Defendant emphasized Dr. Havrilla did not personally perform the autopsy and highlighted records reflecting chronic conditions (including prior bacterial endocarditis, hepatitis C, and a history of intravenous drug use). Dr. Havrilla did not dispute those clinical histories but reiterated her causation opinion, testifying that she "would not have contributed" the dilated heart or other complications as significant contributors in light of the lethal drug levels. She further agreed that "there's no way to look at something and know what's in it" and acknowledged that tolerance varies among chronic users. Though, the 19 ng/mL fentanyl concentration remained, in her view, clearly dangerous.

In sum, Dr. Havrilla's testimony consistently attributed the victim's death to fentanyl and xylazine toxicity, with the fentanyl level "most likely" sufficient by itself and the xylazine level independently capable of causing death; any underlying cardiac or systemic conditions, she said, did not materially contribute to the fatal outcome in this case, and the manner of death was properly classified as an accident. She explained that a drug overdose is categorized as an accidental death.

At the conclusion of the proof, the jury found Defendant guilty of second degree murder and casual exchange. The trial court sentenced Defendant to fifteen years at 100% for the second degree murder conviction and to eleven months and twenty-nine days for the casual exchange conviction, to be served concurrently with each other for a total effective sentence of fifteen years. After the denial of a motion for new trial, Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant first challenges the sufficiency of the evidence to support the conviction for second degree murder. Specifically, Defendant argues that there was no proof that he was aware that providing the victim with fentanyl was "'reasonably certain'

to cause the victim's death." Defendant points to the proof indicating Defendant "believed" the substance was heroin, the fact that he called 911 to report the victim's overdose, the fact that he stayed on the scene until paramedics arrived, and Detective Neely's opinion that Defendant was truthful in his statements to law enforcement. The State disagrees, arguing that Defendant knowingly gave the victim fentanyl because he believed "it's all fentanyl now" and the drug was the proximate cause of the victim's death.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). Circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this Court shall not substitute its inferences for those drawn by the trier of fact. *Id*.

Second degree murder, as charged in this case, is "[a] killing of another by unlawful distribution or unlawful delivery or unlawful dispensation of fentanyl or carfentanil, when those substances alone, or in combination with any substance scheduled as a controlled substance . . . including controlled substance analogs, is the proximate cause of the death of the user." T.C.A. § 39-13-210(a)(3). Second degree murder under (a)(3) "neither expressly requires, nor plainly dispenses with, the requirement for a culpable mental state[,]" so "'intent, knowledge, or recklessness' suffices to establish the necessary culpable mental state." *State v. Hollon*, 671 S.W.3d 561, 565 (Tenn. Crim. App. 2023).

As recently explained by this Court in *State v. Whitehead*, No. M2023-01458-CCA-R3-CD, 2024 WL 4381463, at *8-9 (Tenn. Crim. App. Oct. 3, 2024), *no perm. app. filed*,

> To convict a defendant of second degree murder by the unlawful distribution of fentanyl, the State must prove that: 1) the defendant unlawfully distributed a substance to the victim; 2) the substance delivered to the victim was fentanyl; and 3) the fentanyl was the proximate cause of the victim's death. *Id.* at 566; *see* 7 Tenn. Prac. Pattern Jury Instr. T.P.I. – Crim. 7.05(b). When a defendant is not aware that the substance contains fentanyl, the State may still establish that a defendant acted recklessly by proving beyond a reasonable doubt that:
>> • the defendant disregarded a substantial and unjustifiable risk that the substance delivered to the user was fentanyl or carfentanil; and
>> • the defendant's disregard of that risk "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint."

[*Hollon*, 671 S.W.3d] at 566.

Here, Defendant argues that the proof does not show he acted with "knowledge" that his actions would cause the result. This is simply not the standard. Defendant was charged with violating Tennessee Code Annotated section 39-13-210(a)(3), which does not require a knowing killing. Viewing the evidence in a light most favorable to the State, the proof showed that Defendant gave the victim drugs that did not smell like vinegar, as heroin usually did, and that he purchased the drugs from Reckneck and Fred who were his regular dealers and sold fentanyl. Defendant told Detective Neely that he and the victim were "coming off the fentanyl" and that they were attempting to get clean from drugs. Defendant even admitted to the victim's father that it was fentanyl that killed the victim. Defendant told Detective Neely that fentanyl was something he and the victim would "get on the regular" and that it "wasn't nothing new to either one of us." On the day prior to the victim's death, Defendant gave the victim a little bit of the drugs, and shortly thereafter, she was really "messed up." The next morning, after the victim's reaction to the drugs, Defendant gave her more drugs. The proof was sufficient to show that Defendant unlawfully distributed a substance to the victim; the substance delivered to the victim was fentanyl; and the fentanyl was the proximate cause of the victim's death. Defendant is not entitled to relief on this issue.

*Confrontation Clause*

Next, Defendant argues that the trial court erred by allowing the State's medical expert, who did not perform the autopsy, to testify about the victim's cause of death. Specifically, Defendant argues the testimony violated the Confrontation Clause because he was not permitted to cross-examine the doctor who performed the autopsy. The State disagrees, noting that Defendant stipulated to the admissibility of the toxicology report that contained the amount of drugs in the victim's system, that Dr. Havrilla relied on the toxicology report to provide her expert opinion that the victim died from an overdose of fentanyl and xylazine, and that autopsy reports are not testimonial in nature.

The Confrontation Clause "protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." *Smith v. Arizona*, 602 U.S. 779, 784 (2024). "The Clause's prohibition 'applies only to testimonial hearsay.'" *Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 823 (2006)). "To implicate the Confrontation Clause, a statement must be hearsay ('for the truth') and it must be testimonial—and those two issues are separate from each other." *Id.* at 800.

At the time of Defendant's trial, the governing law on whether an autopsy report prepared by a non-testifying medical examiner—and the testimony of another expert who relied on that report—violated the Confrontation Clause came from our supreme court's decision in *State v. Hutchison*, 482 S.W.3d 893 (Tenn. 2016), *abrogated in part by Smith v. Arizona*, 602 U.S. 779 (2024). In *Hutchison*, the court took on the task of reconciling the different approaches expressed in the various opinions in *Williams v. Illinois*, 567 U.S. 50 (2012), and laid out a framework for determining when an autopsy report should be considered testimonial. 482 S.W.3d at 910.

Under that framework, the court first looked to the broad threshold test drawn from the *Williams* dissent: whether the primary purpose of the autopsy report was to establish past events relevant to a criminal prosecution. *Id.* If that standard was met, the court then considered whether the report bore the "indicia of solemnity," described in Justice Clarence Thomas's concurrence, or whether the report was prepared with the purpose of accusing a targeted individual, as discussed in the plurality opinion. *Id.* If the report satisfied the threshold test and either of the latter two inquiries, it was considered testimonial. *Id.* at 910-11.

Applying that framework, the *Hutchison* court determined that the autopsy report did satisfy the threshold standard because the surrounding circumstances showed it was intended to serve as potential evidence in a criminal case. *Id.* at 911. But the *Hutchinson* court found that the report lacked the formality and solemnity associated with sworn statements. *Id.* at 912. And the court found no indication that the report was created to accuse a specific individual. *Id.* at 914. The court agreed that an autopsy performed in the

regular course of a medical examiner's duties does not become testimonial simply because law enforcement suspects homicide—or suspects a particular person. *Id.* (quoting *People v. Leach*, 980 N.E.2d 570, 593 (Ill. 2012)). As a result, the court held that the report was not testimonial and its admission did not violate the Confrontation Clause. *Id.*

The court also addressed the defendant's complaint that the expert who testified relied on the autopsy report even though he did not perform the autopsy. *Id.* The court noted that this argument "falls by the wayside" once the report itself is deemed non-testimonial. *Id.* And the court pointed to the plurality in *Williams*, which explained that when an expert testifies, the defendant may cross-examine the expert about any statements offered for their truth, but statements repeated solely to explain the basis of the expert's opinion fall outside the Confrontation Clause. *Id.* (citing *Williams,* 567 U.S. at 58). The court also noted authority holding that the Confrontation Clause is not offended when an expert offers an independent judgment, even if that judgment draws upon inadmissible testimonial hearsay. *Id.* (citing *State v. McLeod*, 66 A.3d 1221, 1230 (N.H. 2013)); *see id.* at 914-15. The court therefore concluded that the expert's testimony did not violate the defendant's confrontation rights. *Id.* at 915.

Since *Hutchison*, the landscape has shifted somewhat. In *Smith v. Arizona*, the United States Supreme Court held that when a prosecution expert conveys an out-of-court statement that supports the expert's opinion only if true, then that statement has been offered for its truth—and is hearsay. 602 U.S. at 795. The Court did not decide, however, whether such statements are testimonial. *Id.* at 800-01. Because *Smith* did not disturb *Hutchison*'s testimonial analysis, our supreme court's conclusion that autopsy-related statements are not testimonial remains controlling law. *See State v. Johnson*, No. W2024-00747-CCA-R3-CD, 2026 WL407006, at *21 (Tenn. Crim. App. Feb. 12, 2026), *perm. app. filed* (Apr. 13, 2026); *Hodge v. State*, No. W2025-01156-CCA-R28-PC, 2025 WL 2630297, at *3 (Tenn. Crim. App. Sept. 11, 2025) (order), *perm. app. denied* (Tenn. Mar. 30, 2026); *State v. Green*, No. W2024-00370-CCA-R3-CD, 2025 WL 2027873, at *17 (Tenn. Crim. App. July 21, 2025) (Wilson, J., dissenting), *no perm. app. filed*.

Defendant relies on *Smith*, which was decided several months after his trial, to support his argument that the testimony of Dr. Havrilla violated the Confrontation Clause. The release of an opinion changing the law while a defendant's case is pending on direct review does not alleviate a defendant's obligation to comply with appellate review preservation requirements. *See State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018) (holding that application of a new constitutional rule to cases pending on direct review when the new rule is announced is subject to "existing jurisprudential principles, such as appellate review preservation requirements and the plain error doctrine" and that "if a defendant fails to comply with appellate review preservation requirements, an appellate court must utilize the plain error doctrine rather than plenary appellate review when applying a new rule").

According to the transcript, the parties stipulated "that the report from the NMS Labs is an authentic report of the testing. They have further agreed that the substances that were found in [the victim's] body had not been altered by [Defendant] prior to ingesting by [the victim]." Despite this stipulation, counsel for Defendant objected to the testimony of Dr. Havrilla, arguing that Defendant had "the right to cross-examine the actual person who did the autopsy. . . ." Defendant also raised this issue in his motion for new trial and amended motions for new trial. The issue is properly preserved for plenary review.

However, despite preserving the issue for plenary review, Defendant is not entitled to relief. Unless and until the Tennessee Supreme Court addresses *Smith*, our supreme court's conclusion in *Hutchison* that autopsy-related statements are not testimonial remains controlling law. *See Hodge*, 2025 WL 2630297, at *3; *Green*, 2025 WL 2027873, at *17. Because the autopsy report prepared by Dr. Danielson is non-testimonial, Defendant's argument that its admission through Dr. Havrilla's testimony "falls by the wayside[.]" *See Hutchinson*, 482 S.W.3d at 914.

To be clear, we conclude that the record in this case, including Defendant's stipulation of the NMS Labs report of testing and the introduction of the victim's autopsy into evidence through the testimony of Dr. Havrilla, never supported an implication of a confrontation clause violation. This is true because the autopsy report was (1) not testimonial, and (2) not prepared for the purpose of accusing Defendant. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

*S/Timothy L. Easter*
TIMOTHY L. EASTER, JUDGE

- 10 -